C. C. BAKER, Administrator, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

**Railroads: TRESPASSER: EVIDENCE.**   A section hand walking home on the track after his day's work is done is not rightfully on the track because his foreman had told him to notice the track closely whenever he went over it and report if anything was wrong.

SAME: DUTY OF CREW.   Trainmen owe no duty to such an employe, till he is discovered.

**Contributory Negligence: PRESUMPTIONS.**   The presumption that the instinct of self-protection makes one diligent is overcome by evidence that an employe, off duty, was struck by a train which he had reason to expect and which he could have heard four hundred feet away.

*Appeal from Davis District Court.*—HON. H. C. TRAV-
ERSE, Judge.

WEDNESDAY, MAY 29, 1895.

Action for personal injuries. Judgment for
plaintiff, and the defendant appealed.—*Reversed.*

*Robert Mather, Wm. McNett,* and *Carruthers &*
*Rominger* for appellant.

*Eichelberger & Taylor* for appellee.

Granger, J.—Plaintiff is the administrator of the
estate of Frank Mitchell, deceased. Mitchell was ·
killed on the defendant's line of road about the twenty-
fourth day of November, 1892. The circumstances are
substantially as follows: Mitchell was at the time,
and for about five months had been, a section hand on
defendant's road on the section where the accident
occurred, which section was some six and one-half
miles in length, the town of Unionville being its east-
ern limit. Mitchell resided near defendant's line of
road, and about three and one-half miles west of Union-
ville. He was not regularly a "track walker,"·
that is, one whose duty it was to walk along the
line and inspect the track, but the foreman of
the section had, on the day before the accident, directed
Mitchell to, the next morning, walk the track, and, on
the morning of the day of the accident, Mitchell walked
west from his home on the track to the end of the sec-
tion, and then back to Unionville, reaching there about
10 o'clock A. M., where he worked in the yards with the ·
rest of the section gang at laying rails the rest of the
day. About 5 o'clock he quit work to go home, and
while near the yard limits at Unionville, and after he
had started home, he was struck by a construction

train, and killed.   No one saw the accident, and the fact
of it was not known until the next morning, when the
body was found on the track.   The train that killed him
passed the point where the body was found about
twenty-two minutes after five o'clock the evening
before.   The train that struck Mitchell had been
standing in the yards at Unionville for some time
before the accident, and, while standing there a pas-
senger and a freight train had passed Unionville,
going east.   After these trains had passed, the
construction train moved east some two or three
miles, to get a construction gang of men and take
them to Centerville.   Centerville is west of Union-
ville, and the train, after the gang was on board,
started west, passing Unionville without stopping,
and struck Mitchell as we have stated.   While the
train did not stop at Unionville, it "slowed down,"
so that the conductor, who was at the station, gave to
the engineer his orders, and himself boarded the
caboose of the train.   The train carried a head-
light, and, as it approached Unionville from the
east, it could be seen from the point where the
body was found nearly a mile, and then continuously
to the place of the accident, except for about three
hundred feet, where the view was obstructed by what
is called a "grain house."   From this house to where
the body lay it is one thousand three hundred feet, and
for that distance there is no obstruction to the view.
The negligence charged against the defendant is in
running the train at a high and dangerous rate of
speed, and a neglect to give the proper signals; and the
jury found that the defendant in running the train was
negligent, and the finding has support in the evidence.
After the testimony was closed, the defendant asked
the court to instruct the jury to find for the defendant,
which the court refused, and appellant now urges that
it should have been done on the ground of the contrib-

utory negligence of Mitchell. Some other facts will be noticed in the consideration of the case.

It seems to us that there is an entire absence of evidence tending to show a want of contributory negligence, which the plaintiff must show to recover. The deceased was last seen about five hundred and fifty feet from where his body was found, walking on the track towards his home, and this was just before the train passed, and the inference is quite clear that the train killed him. But as to his own care or caution we find no evidence whatever. Some claims are made by appellant which we will notice. The jury returned some thirty-five special findings, some of which are important in this connection. It found that Mitchell was rightfully on the track when he was struck, and that he was exercising ordinary care under all the circumstances. It also found that he had good hearing and eyesight, and that a person of fair hearing could have heard the rattle of the train about four hundred feet away, when west of the depot.

If it is claimed, as it must be to make it significant, that the finding that Mitchell was rightfully on the track means that he was there in such a way that the persons operating the train were required to exercise care with reference to him, as they would be required to do as to persons doing duty upon the track, the finding cannot be sustained, for there is absolutely no evidence to support it. The evidence is that about 5 o'clock the foreman told Mitchell that it was time to quit, and for him to go home, and to again walk the track the next morning. Mitchell quit work, left his bucket, a wrench, and his overcoat in the grain house, and went over town, and then came back, and took the things from the grain house, and started home. It was a "foggy, misty" night, and getting dark. One Jimmie Underwood, a lad fifteen years old, was working for the com-

pany, and was sent by the agent to put out the switch
lights, and he went first to the west light in the yard,
and then came east, and on his way met Mitchell, and
he was the last person who saw him alive. He said
in his testimony: "First one I put up at west end of
stock yards. Next one I put up at west end of pass-
ing track. I walked on the side track. I knew the
construction was liable to come through. I was walk-
ing on the north track when I met Mitchell. He was
going west. He was carrying his overcoat on one
arm and dinner bucket on the other. He was walk-
ing at his usual pace, 'kind of fast,' going west on
the main track between the rails. I knew the train
was coming. Saw the headlights. Tt was on the top
of the hill east of the depot; about a mile, I expect.
There was a little curve west of the depot. Did not
hear the train whistle for the station. Do not remem-
ber hearing the bell ring. Do not remember being
called on by the agent and Mr. Stackhouse seven or
eight days after the accident. I remember talking to
Stackhouse. Do not remember telling him I heard the
bell ring. Don't think it did. Do not remember
noticing the sound of the train. Do not know that I
was paying any attention to the sound. If I heard
it, it was not impressed upon my mind. If I had heard
the whistle east, it would not have impressed my mind.
All I am able to say is, if it whistled, I do not remember
it. Mitchell was walking in the middle of the main
track nearest the south rail. He was not doing any-
thing but walking. Did not have a lantern. I was
running. Was in a little hurry. I wanted to go to a
party that night. It was misting a little bit. The
train was coming west from the depot when I met
Mitchell." Nothing in Underwood's testimony in any

way indicates that Mitchell was then walking the track to examine it. It is clearly apparent that he was not doing so. The only evidence on which reliance is placed in argument to show such a fact is that of one Ethridge, who was also a hand on the same section, and he said he heard the foreman tell Mitchell the night before the accident, and at other times, that "any time he would be going over the road to notice the track closely, going or coming from home, and, if anything was found wrong, to let him know." Such a direction cannot be construed as an order to go upon the track for such a purpose, outside of his general employment. His day's work had ended, as had that of the men at work with him, and they had gone to their homes, and Mitchell was no more on duty at the time of the accident than was the witness Ethridge, who quit work just after Mitchell did, and was at his boarding house, washing, and changing his clothes, when the train passed. It is clear that Mitchell was not on the track at the time of the accident, by authority, and equally clear that he was not doing duty there. The finding is a mere assumption.

We next inquire as to what support there is for the finding that Mitchell was exercising due care under all the circumstances. And here again there is an entire absence of evidence. That he knew, as did other section men, that the train was likely to pass Unionville about that time, is not open to question. He was merely walking homeward, unengaged in any way to detract his attention or excuse a want of care for his safety. The claim is that the night was a wet one; the wind unfavorable for his hearing; the train a light one, so that it did not make the usual noise, and that the speed of the train was great. The evidence is quite conflicting as to some of these facts, but conceding all where there is a conflict in favor of the finding, and what is the situation? Mitchell's

hearing was good, and, as the jury found, he could hear
the rattle of this train about four hundred feet away.
Then why was he struck?    This query calls for the
facts to show why he remained on the track after he
could hear the train and after he had time to step off.
The law devolves this duty on the plaintiff, and there
is really nothing to explain it.   We do not say that the
plaintiff must produce direct evidence to explain such
conduct, but there must be in the evidence something
to excuse the neglect to leave the track, or there is a
failure to show absence of contributory negligence. In
fact, it would seem to be a very strong showing of negli-
gence.   It seems to us that the argument of appellee
is something of a confession of the doubtful condition
of the evidence in his favor on this point, for it is
treated as if the fact of Mitchell's negligence must
appear or his diligence will be assumed.   We quote
from the argument as follows:   "Is there any evidence
of any act on the part of decedent which would be
called negligence?"   It is again said:   "If Mitchell
had ordinary hearing, he must have necessarily exer-
cised ordinary care in that direction.   This must be
conceded, unless the theory of the defense is suicide.
The manner in which the man was struck indicates that
he was on his feet, erect, at the time of the collision.
He could not have been in a better position to hear.
While there is no evidence that he was constantly
intent upon hearing, yet there is no evidence to the con-
trary.   The same is true with reference to his seeing.
But the law only exacts ordinary care, such as an
ordinarily prudent man will use.   This is well settled,
and the defense of contributory negligence will avail
nothing unless an absence of ordinary care is shown."
The fault with the argument is that it assumes an
erroneous proposition of law.   Contributory negli-
gence is not a defense.   Its absence is a matter to be
pleaded and proven to justify a recovery.   This rule

is recognized by the averments of the petition in this case, and we incline to think the argument is rather forced by the situation. Divest the argument of its application to contributory negligence as a defense, so that the absence of proof is favorable to defendant, and appellee's argument is not against our conclusion. The concluding words of the argument quoted are that "contributory negligence will avail nothing unless an absence of ordinary care is shown." The rule of this state is that contributory negligence will avail unless the fact of ordinary care is shown, so as to prove the absence of negligence. It is quite likely that this argument has obtained in the trial of this case, and that the jury became impressed with it, for in no other way can its conclusions be accounted for.

Under a division of appellee's argument, "As to the Law and Adjudicated Cases," it is urged that it is the proximate and not the remote cause of the injury which determines the negligence, and it is then claimed that the negligence of the defendant is expressly shown, "whilst on the other hand there is no act of negligence proven of which Mitchell was guilty." It will be seen that the same thought obtains in this division of the argument as to an absence of proof of contributory negligence. In fact, it pervades much of the argument in the reasoning and citation of authorities, and, with the correct rule applied, they cannot be of force. Importance is attached to the fact that the natural instincts for self-preservation, of which the jury could take notice, would have led to the exercise of care on the part of Mitchell. It was proper for the jury to consider that fact, and, as we have said, direct or positive evidence is not required to show an absence of negligence. If it may be inferred from all the evidence in the case, it is sufficient. The rule in this respect is noticed in *Greenleaf v. Railroad Co.*, 29 Iowa, 14; *Way v. Railroad Co.*, 40 Iowa, 345;

*Burns v. Railroad Co.*, 69 Iowa, 456 (30 N. W. Rep. 25); and *Hopkinson v. Knapp & Spaulding Co.*, 92 Iowa, 328 (60 N. W. Rep. 653). We are not disposed to deny to plaintiff the benefit of the rule as repeatedly announced, and we affirm the repeated application of it. In each of these cases the injury happened when the person was engaged in the line of employment, and in some, if not all of them, his conduct is traced so closely to the accident that from it, aided by a presumption that arises from a natural disposition to avoid injury, the fact of diligence could well be found. That is not the situation of this case. All that can be assumed in this case is that Mitchell was doing what he was when Underwood saw him, and that is, walking homeward. It will not do to say that one can go upon a railway track without having a duty there, and if, while walking, he is struck by a train, the jury may assume from the instincts of self-preservation alone that he was diligent. But this case is not as favorable as that for plaintiff. He had good hearing. If he was exercising that faculty,—and all will agree that it was his duty to do so,—under the finding of the jury he heard that train in time to get off the track. If he did not hear it, it was because he was not attentive, and in either case it was negligence. The facts of this case clearly overcome any presumptions to arise from the rule as to instinct of self-preservation.

There is a further claim that, conceding the negligence of Mitchell, the jury found that he could have been seen in time to have avoided the injury after the negligence was discovered. The finding is only that there was time to stop the train after he could have been discovered. The finding is not that, after his negligence could by diligence have been known, there was time to stop the train and avoid the accident. It is not a rule that a train must be stopped when a per-

son is seen on the track, but only when it is reasonably apparent that such a person is in danger. It may be further said that the rule is not applicable here, as we hold that the finding that he was rightfully on the track, so as to require diligence of persons running the train to know of his presence, is not supported by the evidence. As to such persons the company owes no duty until they are discovered. *Masser v. Railway Co.,* 68 Iowa, 602 (27 N. W. Rep. 776); *Burg v. Railway Co.,* 90 Iowa, 106 (57 N. W. Rep. 680). Under the evidence, the court should have instructed for the defendant.—*Reversed.*